## GUSTAV FAST

*vs.*

## SIDNEY B. AUSTIN.

*Action for Value of Services—Negotiation of Contract—Manufacture of Machines—Evidence—Instructions.*

In an action to recover compensation for plaintiff's services in negotiating a contract by which defendant was enabled to secure, on a royalty basis, the manufacture of a machine invented by him, an instruction, given at the instance of plaintiff, that if the jury find that defendant promised to compensate plaintiff, the plaintiff is entitled to recover such an amount as the jury may find to be fair compensation, not exceeding the amount named in the declaration, *held* erroneous, as ignoring defendant's evidence that the compensation agreed upon was a position with the company, in the event he and the plaintiff succeeded in incorporating one to take over, manufacture and sell the machines. p. 18

If the jury accepted the defendant's version of the agreement, then, notwithstanding they found that he agreed to compensate the plaintiff for his services, the plaintiff could not recover unless there was sufficient evidence to show, and the jury further found, that such a corporation had been formed, and that the defendant had failed or refused to give the plaintiff the promised position. p. 18

· It was for the jury to determine from all the evidence what the contract between plaintiff and defendant was, and they should have been instructed as to the law applicable to the facts found by them. p. 19

Where some of plaintiff's evidence tended to show an agreement between plaintiff and defendant that defendant would compensate plaintiff for his services and for material supplied

by him to defendant, when defendant was in a position to do so, if the jury adopted that view of the case, plaintiff was entitled to recover the value of such services and materials.        p. 19

Testimony that plaintiff was asked by defendant if a certain machine company would manufacture his machine for the latter; that the former thereupon explained the machine and value of the patents to an officer of the company, and that he introduced defendant to such officer, fails to support an allegation that plaintiff conducted the negotiations which resulted in a contract by such company for the manufacture of the machine, particularly when those negotiations related to a matter entirely different from that in view when he made the introduction. p. 20

There being no evidence that plaintiff participated in the negotiations resulting in the contract between defendant and the machine company, a prayer by the defendant that plaintiff, being an employee of the company, could not recover for services rendered in such negotiations, was properly refused, as having a tendency to confuse and mislead the jury.             p. 21

If the agreement was, as some of plaintiff's evidence tended to show, that defendant was to compensate the plaintiff for services and materials furnished, when able to do so, regardless of whether they succeeded in forming a company to take over the patents, the fact that plaintiff, after rendering the services, abandoned any further effort to form such a company, would not deprive him of his right to compensation for such services and materials, unless there was an agreement to that effect.                    p. 21

Even if it be assumed that plaintiff was entitled, under the circumstances, to recover for introducing defendant to an officer of the machine company, the amount realized by defendant from the contracts made with such company *held* not material upon any theory warranted by the evidence.             p. 22

A question asked by plaintiff of a witness, for the purpose of showing what connection plaintiff had with the introduction of a certain capitalist to defendant, was not objectionable, and even if it had been objectionable, it is no cause for reversal, if the answer did not injure defendant.             p. 22

Questions asked by plaintiff, eliciting evidence that defendant was eventually employed by the machine company, and as to

the amount of his salary, should not have been allowed to be answered, there being no evidence that the contract of employment was the result of negotiations conducted by plaintiff.  p. 22

Evidence that plaintiff told an officer of the machine company that he was interested in the negotiations between such company and defendant was not pertinent, in view of the lack of evidence that plaintiff participated in the negotiations.  p. 22

Evidence that a person who assisted defendant by making drawings and otherwise was not an employee of plaintiff, even if objectionable, could not have injured defendant.          p. 24

An instruction that a recovery by plaintiff cannot exceed an amount named, being the amount claimed in the declaration, is proper, when the evidence produced by plaintiff values his services at more than that amount.                              p. 19

Where the suit was not brought under the Speedy Judgment Act, the plaintiff was not confined by the Act of 1914, chapter 378, to the account filed with the declaration.          p. 20

An exception to a ruling on a special exception to a prayer should not be included in the bill of exception to the ruling on prayers, but should be made the subject of a separate exception.
p. 21

That one had practised as a lawyer for more than twenty-five years, and had had some experience in the development of property and financing propositions, including patents, did not qualify him to express an opinion as to the value of services rendered by a mechanical engineer in passing upon the value of patents for a mechanical device, and in conducting and making reports of tests of a machine.                              p. 23

Although there was no motion to strike out an answer to a question improperly calling for the opinion of a witness, he should not have been permitted, over objection, to answer a question as to the reasons for his opinion, if his answer to the previous question was based upon an assumption as to plaintiff's services which there was no evidence to warrant.          p. 23

An exception to a question calling for the opinion of a witness is sufficient to raise the question of the qualification of the witness as an expert, although not specifically based on that ground.
p. 24

A letter from plaintiff's counsel to defendant's counsel is not admissible in support of plaintiff's case.                    p. 24

*Decided June 24th, 1919.*

Appeal from the Superior Court of Baltimore City (DAWKINS, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER and STOCKBRIDGE, JJ.

*Harry E. Karr* and *Edward M. Hammond,* for the appellant.

*Ralph Robinson* and *Howard Bryant,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

This suit was brought on the common counts, and on a special count alleging that the defendant "engaged the plaintiff to open and conduct negotiations with the Poole Engineering and Machine Company, a corporation located at Woodberry, Baltimore City, in the State of Maryland, for the manufacture of a mechanical device * * * known as a 'turbo gear,' the said defendant agreeing with the plaintiff to pay him for his services in such behalf exerted; that the plaintiff thereupon opened and entered into negotiations with the Poole Engineering and Machine Company and that by reason of the skill and fidelity with which he opened and conducted said negotiations * * * said defendant was enabled to make and did make an agreement or agreements with the said Poole Engineering and Machine Company, * * * under the terms of which agreement or agreements the Poole Engineering and Machine Company manufactures the said mechanical device, or 'turbo gear,' and pays the said defendant large sums of money by way of salary and in royalties;" notwithstanding which the defendant refused to compensate the plaintiff, and he claims $5,000.00.

There was filed with the declaration the following account:

"Baltimore, Md., August 29th, 1917.
"Gustav Fast, Esq.,
        "To Sidney B. Austin,      Dr.
    "To services rendered as per declaration attached,
being 10% on $50,000......................$5,000.
                    "Received payment."

The defendant filed the general issue plea, and the trial resulted in a verdict and judgment for the plaintiff for $5,000.00. The present appeal is from that judgment, and the record contains sixteen exceptions to rulings of the Court below on the evidence and one to the action of the Court on the prayers.

The defendant, who in 1913 was employed by the Crown Cork & Seal Company "as inventor and development engineer," invented a machine known as the 'turbo gear,' and upon the completion, in that year, of his first machine, he was introduced by his patent attorney, Mr. Howard, to Mr. Ralph Robinson as one who would likely be interested in forming a company to manufacture and sell the machine. Certain gentlemen to whom Mr. Robinson referred the matter, and who examined the machine, were not favorably impressed with its "commercial possibilities," and the defendant was later informed by Mr. Howard that Mr. Robinson would not be interested in it any further. He did not see Mr. Robinson again until two years later, in 1915. In the meantime he had built his second machine, which in his judgment was an improvement on the first and "an absolute success." He then left the employ of the Crown Cork & Seal Company and made his headquarters at the office of the Universal Machine Company, in the Industrial Building, trading under the name of the "Turbo Gear Company." Having spent $5,000.00 of his savings in developing the machine, he found it necessary to get in touch with some one to raise capital, and recalling his acquaintance with Mr. Robinson he went to see him again.

The plaintiff testified that he is a mechanical engineer, and that in May, 1915, he was introduced to Mr. Fast, the defendant, by Mr. Robinson in his office; that Mr. Robinson told

him that Mr. Fast was endeavoring to get financial aid in putting his turbo gear on the market and had come to him for assistance. He, plaintiff, was "brought into it to assist in" that. He went over Mr. Fast's patent applications, and finding them unsatisfactory, he went to Washington with him and introduced him to patent attorneys there with whom he had had dealings for many years and had them take the matter up with the view of securing satisfactory and broad patents, which was accomplished. In order to present the thing properly to financial people it was necessary to have the patents in shape and also to have thorough and satisfactory tests made of the apparatus. He got permission to have the tests made at the Bureau of Standards in Washington, but in the meantime Mr. Fast, through some friend in the Gas Company, arranged to have the tests made there. He worked with Mr. Fast on these tests, and made a supplementary report, the report of the Gas Company not being full enough to answer their purpose. They got all the reports, patent papers and reports from the patent attorneys on the "patentability of the idea," and got them together in form for proper presentation to financial people. As he understood it, Mr. Robinson was in the matter "merely as a consulting matter," and had "one friend whom he wished to see in regard to financing the matter," but aside from that he left the question of taking the matter up with moneyed people entirely with him. During June, July and August Mr. Fast made his headquarters in his office, and they worked together and made several attempts to reach different people without success. While Mr. Fast was in his office he wanted certain drawings, etc., prepared and was not able to finance them. He, plaintiff, did not feel that he was able to pay a draftsman, so he turned Mr. Fast over to Mr. Harman, who had at one time been in his employ and who was still in his office, but not in his employ, and told Mr. Fast he could make whatever arrangement he wished with Mr. Harman, and Mr. Harman did several weeks work on the drawings, for which, he understood, he had never been paid. The drawing materials

belonged to him, the plaintiff, and were supplied by him with the understanding that they were to be paid for when Mr. Fast was in a position to do so. "During all this time they were making these efforts to finance this thing it was clearly understood that when we succeeded in doing so I was to share in some way in the proceeds; it was not possible to make any definite arrangement because we did not know what sort of a financial plan would be put over; finally after attempting to interest several people Mr. Harman in my office suggested to me that he take the matter up—Mr. Harman had been in my employ for some time on a salary, but just at that time the war knocked out a couple of good contracts I had in the office and having very little to do Mr. Harman was working for me and was being paid by me for what work was actually done by him for me with the privilege of bringing work into the office himself with the understanding that of the work which was brought in we would each take our—in other words we had an understanding between us in lieu of the fact I was not paying him a salary at that time he was to draw a salary for what he actually did and any business brought into the office by him was to be equally divided between us after the expenses and certain rates for his time and myself had been settled." He directed Mr. Harman to take the matter up with certain parties whom he had suggested, among them Mr. C. W. Harvey, and as a result Mr. Harvey came to his office and went over the matter with him, and was a day or so later introduced to Mr. Fast by Mr. Harman and negotiations were started. During the period of about four months that Mr. Fast was working in his office it was understood they were working together and the question of compensation was mentioned, but no definite compensation could be decided upon until it was known what kind of a financial proposition could be worked out. In the latter part of November, 1915, he gave up his office, or left it and went into the employ of the Poole Engineering and Machine Company. Mr. Robinson's relations with the matter ceased very shortly after he introduced the plaintiff to Mr. Fast, except that there was a sort

of understanding that when it came to the question of incorporating the company "and so on" he was to handle the legal matters. Shortly after he entered the employ of the Poole Company he learned that Mr. Fast and Mr. Harvey had concluded their arrangements and were starting their work, and at that time, sometime in the winter of 1915-16, he took up with Mr. Fast the question of his part in the affair, "and where I came into it," and Mr. Fast stated that he had not turned his patents over to the corporation and consequently had not received anything for them and was unable at that time to make any settlement but would do so when the affairs were straightened out. He saw Mr. Fast a number of times during the next three months, and "practically the same conversation was repeated."

About a year later, about October, 1916, while he was employed by the Poole Engineering Company, Mr. Fast called him up and told him he wished to make a contract with the Poole Engineering Company to manufacture their gears. He took the matter up with Mr. Shoemaker, Vice-President of the Poole Engineering Company, and went into the matter with him, and explained to him what it was, its value and the value of the patents, and "introduced Mr. Fast to him and negotiations were started." After he heard later that the Poole Engineering Company had refused to consider a contract "on a manufacturing proposition," and that negotiations on a royalty basis had been started, he asked Mr. Fast to meet him downtown, and he then "endeavored to impress on him" that he was not acting in that matter as an employee of the Poole Engineering Company, but considered it merely as a culmination of the work he had been doing in the matter for nearly two years, and that he would expect his compensation out of it. Mr. Fast assured him that he need have no worry about the matter, and that he would immediately get in touch with Mr. Harvey, who was interested with him in it at that time, and would agree on some definite amount of compensation. In March, 1917, he got Mr. Robinson, his attorney, to write to Mr. Fast asking him to come

to some agreement in the matter. Mr. Fast did not reply to the letter, but he saw him in the lunchroom of the Poole Engineering Company one day, and Mr. Fast told him he had "received a letter" and that he would get in communication with Mr. Harvey as soon as possible and arrange the matter. After Mr. Harvey became interested in the turbo gear he and Mr. Fast had different parts of the machine built at various places around town—were "trying to get it going under their own scheme," he understood—and the Poole Engineering Company did some of the work for them. The bill filed with the declaration was made up by his counsel upon the best information attainable at that time as to what "Mr. Fast's interest in this matter was," but since then he had gotten information that made him feel that the figure mentioned was too small, and that Mr. Fast was in receipt of more than $50,000.00. He had been informed that the contract with the Poole Engineering Company guaranteed him a royalty of $15,000.00 a year, with a possibility of much larger receipts, and that Mr. Fast was also employed by the Poole Engineering Company at a salary of $6,000.00 a year. On cross-examination the plaintiff stated that the bill for $5,000.00 attached to the declaration was predicated upon the amount he understood Mr. Fast was receiving from the Poole Engineering Company, and that his whole claim was based on the contract of Mr. Fast and Mr. Harvey with the Poole Engineering Company "as the final culmination of all the work he had done." He had never rendered Mr. Fast an itemized bill or any bill, but had attempted a number of times without success to get together with him. He never rendered any bill for opinions he gave in regard to patents and for services he rendered in connection with the patent attorney, but his services in connection with the test of the machine by the Gas Company and the report he made were worth about $500.00, and his services in handling the patent in connection with the patent attorneys were worth from $300.00 to $400.00. "The main work," the main basis for his claim for services at that time "is the test reports and the general report on gear construction and the letter addressed

to Mr. Hamburger, and the fact that I was working there consulting with Mr. Fast and working with him all the time; there was no question of a bill or of an exact amount on that; it was understood when the time came to incorporate the company I would be interested in it or compensated in some way to be agreed upon between us. * * * I had that understanding with Mr. Fast." He recalled a conversation at the time Mr. Robinson sent for him to meet Mr. Fast, in which Mr. Robinson suggested that his compensation would be a position with the company, but that was not all of it; the plan then was to form a small company, in which he was to receive a position and one-eighth of the stock of the company; "that was the understanding at that time, but that matter was never carried out." In addition to the items of $700.00 or $800.00 for work on patents, reports and Hamburger letter, the $4,200.00 or $4,300.00 based on the contract with the Poole Engineering Company, he thought he was entitled to $2,500.00 or $3,000.00 for the introduction of Mr. Fast to Mr. Harvey. On the percentage basis, the introduction of Mr. Fast to the Poole Engineering Company is worth $7,500.00. At the time Mr. Fast asked him to come to see him in regard to the Poole Engineering Company building the machines for them he was not promised any compensation for anything he might do in connection with the Poole Engineering Company, nor was he promised anything at the time he introduced Mr. Fast to Mr. Shoemaker, Vice-President of that company. When he went to see his attorney about taking up his claim in this case against Mr. Fast his claim was not based solely upon the contract of Mr. Fast and Mr. Harvey with the Poole Engineering Company, but "was based upon" his "entire connection with the matter, covering a period of one and a half to two years."

Mr. Harman, who was called as a witness by the plaintiff, testified that he was a mechanical draftsman, and that at the time Mr. Austin met Mr. Fast he was not in the employ of Mr. Austin; that work had become slack, and that he began to look around some for himself, and that he had an understanding with Mr. Austin that they would share the profits

in any work that he brought in. He further testified that he had no written agreement with Mr. Fast in regard to the work he did for him while he (witness) was in Mr. Austin's office, but that he and Mr. Fast had an understanding—"I suppose it was just the ordinary agreement"—that he would do the work for Mr. Fast, and that Mr. Fast would give him something—a position in the company—when the company was organized. Mr. Austin did not introduce Mr. Harvey to Mr. Fast. Mr. Austin and another gentleman, a friend of Mr. Fast, had been endeavoring during the summer to secure capital to build a plant and carry on the work of manufacturing the turbo gears. He had some friends he thought might be interested in it, so he borrowed all the data Mr. Austin had, and went to see two people before he saw Mr. Harvey; that he left the data with Mr. Harvey and arranged with him to meet him a day or so later, after he had an opportunity to examine the data, and be introduced to Mr. Fast, and that he introduced him to Mr. Fast in August or September of 1915 at the office of the Universal Machine Company in the Industrial Building.

Mr. Harvey, a witness for the plaintiff, testified that he and Mr. Fast and some other associates undertook to organize a Turbo Gear Company to take over Mr. Fast's patents. Hambleton & Company were interested until Mr. Hambleton and he and Mr. Fast had a disagreement, when Mr. Hambleton dropped out, and he, witness, "took over the liabilities of the company." The company never acquired the patents. Mr. Fast owns the patents and he assigned to him a twenty-five per cent. interest in the patents and a ten per cent. interest to his, witness', brother, and he, his brother and Mr. Fast are the only participants in the fruits of the contract made with the Poole Engineering and Machine Company. Mr. Austin had nothing to do with his meeting Mr. Fast. After Mr. Hambleton withdrew from the proposition they realized that they had to "turn out" the machines in greater quantities to keep down the cost of production; they had to turn out about sixty gears. They had a conference with Mr. Nelligan and Mr. Karr at the Safe Deposit Company, and they advised

them not to try to raise capital at that time to put up a factory, but to go to different machine companies to get a contract with them to make the machines, about two hundred at a time, and that accounts for their taking up with the Poole Engineering and Machine Company the question of the company manufacturing some gears for them. They went to a Philadelphia concern and also to see Bartlett & Hayward, and as he did not know anyone at the Poole Engineering and Machine Company, Mr. Fast went out there. Bartlett & Hayward said they were too busy with munition contracts, and they never got any definite answer from the Philadelphia concern. He went out to the Poole Engineering and Machine Company with Mr. Fast the third time he went to see them, and took up with Mr. Brady and Mr. Shoemaker the proposition of that company making two hundred machines for them. They said that they would not consider it in that way, but that the company would manufacture the machines on a royalty basis. During these conferences with the Poole Engineering and Machine Company, the only time he ever saw Mr. Austin was on one occasion when he was passing through one of the outer offices on his way into Mr. Shoemaker's office, and he never heard of any commission to be paid by Mr. Fast or anybody else to Mr. Austin.

Mr. Shoemaker, Vice-President of the Poole Engineering and Machine Company, another witness for the plaintiff, testified that Mr. Austin introduced him to Mr. Fast in his, Mr. Shoemaker's, office, at Woodberry, in order that Mr. Fast might discuss with him the proposition of the company manufacturing the turbo gear for the Turbo Gear Company, and that the result of the introduction was that the Poole Engineering and Machine Company declined to manufacture the gear for the Turbo Gear Company. Later he took up with his associates in New York the question of the potential possibilities of the device, and the directors of his company also discussed the question of buying the patents, and the question of obtaining a license to manufacture, use and sell the machines. The negotiations took about four months, and finally resulted in the contract between the Poole Engineer-

ing and Machine Company and Mr. Fast, on the 16th of January, 1917, licensing the Poole Engineering and Machine Company to manufacture the gear as sole manufacturer of it and the sole users and distributors in the United States and Canada for a period of five years. Witness did not want to disclose the terms of the contract, but said that the minimum royalty was fifteen thousand dollars. About three months later the Poole Engineering and Machine Company employed Mr. Fast at a salary of $6,000.00 a year, but the contract of employment was distinct from the other contract, and was "terminable each year by either side." Mr. Austin had nothing to do with the making of the royalty contract between the Poole Engineering and Machine Company and Mr. Fast, and was not present during any of the negotiations looking to the consummation of the contract. He understood that Mr. Austin had some interest in the Turbo Gear Company, whether as stockholder or not he did not know, and was not interested. Mr. Fast owned the patents and had not assigned them to the Turbo Gear Company, and hence the negotiations and contract were with him, but that he did not know or hear that Mr. Austin was going to claim a commission for introducing Mr. Fast to him. Whether the Poole Engineering and Machine Company would have permitted Mr. Austin to collect a commission from someone it was doing business with would have depended largely on circumstances. It was not discussed at the time, and he was not prepared to say whether the company would have permitted him to do so or not. They had in special cases permitted salaried employees to get a commission on devices, but not as a general rule; the company was opposed to it.

Mr. Robinson, a witness for the plaintiff, testified that at the time he brought Mr. Fast and Mr. Austin together in his office in May, 1915, and they were discussing the formation of a company for the purpose of getting the turbo gear on the market, he made a memorandum of a scheme of division of the stock of such company, and that according to that scheme Mr. Fast was to receive 13/24 of the stock, the capitalists who

put up the money were to have 8/24, and Mr. Austin was to receive 3/24.

The defendant testified that when he went to see Mr. Robinson in the Spring of 1915 he seemed to be very much interested, and said he had a friend, Mr. Austin, who was a very capable engineer, and that he would like him to come into the proposition, and if they succeeded in forming a company and financing the proposition he would like him to give Mr. Austin a position with the company; that he agreed to do that, and that Mr. Robinson then telephoned Mr. Austin to come up to his office. He and Mr. Austin went to work, as advised by Mr. Robinson, to get tests made and to get information in regard to the validity, infringements, etc., of the patents, and it was understood that all the work they would do together was for the purpose of collecting data to give to Mr. Robinson so as to enable him to promote the company. They talked the thing over about compensation, and it was distinctly understood that Mr. Austin should get a position with the company, and no other arrangement was made. Mr. Austin wanted to raise $5,000.00 himself to take stock in the company, but later found that he could not raise the money. He had his office at the Universal Machine Company, but there was so little room there he had to do his drawing and write his letters at home, so Mr. Austin invited him to make his headquarters at his office and to use what he had there. They worked together there on reports, etc., with the understanding that he was not to pay for the use of the office, etc., as he was not able to do so, and that Mr. Austin was to get a position with the company when it was organized by Mr. Robinson. Mr. Austin told him that Mr. Harman, who worked in his office, would be glad to do any drafting work he required, but he told Mr. Austin he could not "avail himself of that" because he did not have the funds, and Mr. Austin then said that he did not pay Mr. Harman anything, and that he, the witness, could settle that with Mr. Harman. He had a talk with Mr. Harman, and told him that he could not pay him for any work he would do for him, but if the

company was organized he would give him a position, and
that was the arrangement he had with Mr. Harman.  He and
Mr. Austin prepared the tests and wrote the reports in Mr.
Austin's office, and he continued to go to his office every day
or so from about the middle of June to the 16th of October,
1915, when he, the witness, left Baltimore.   Mr. Robinson
never succeeded in organizing the company.   Mr. Harman
introduced Mr. Harvey to him, and he didn't think Mr. Aus-
tin knew Mr. Harvey.   Mr. Harman brought Mr. Harvey to
the Universal Machine Company building to see his machine
and to introduce him.   He never saw Mr. Harvey and Mr.
Austin together, never talked the matter over with Mr. Har-
vey in the presence of Mr. Austin, and never understood that
Mr. Austin had anything to do with his introduction to Mr.
Harvey.   After he and Mr. Harvey discussed the matter
from an engineering, manufacturing and financial point of
view, Mr. Harvey was willing to promote the company and
to undertake to finance it.   After he came back to Baltimore
from East Orange, about the first of January, 1916, he and
Mr. Harvey had a conference in Mr. Hambleton's office, "and
the matter was settled with them."   Mr. Austin had no con-
nection in any way with the conferences with Mr. Harvey and
Mr. Hambleton.   When he, the witness, left Baltimore on
October 16th, 1915, to go to East Orange for the purpose of
reducing his living expenses, he left his "live letter file" with
Mr. Austin, and had his mail redirected from the Industrial
Building to Mr. Austin's office, and asked him "if he would
please take care of the inquiries that came * * * and forward
the mail to me."   A week or two later Mr. Austin took a posi-
tion with the Poole Engineering and Machine Company, and
Mr. Harman attended to those matters for witness afterwards.
After he left for East Orange, Mr. Harvey undertook the
promotion of the company, and took up the negotiations with
Hambleton & Company, which "were consummated" in Janu-
ary, 1916, and from that time on Mr. Hambleton financed
the company until about December, 1916, and during that
time Mr. Harman, to whom he had given a position as he

had promised to do, was working for him. Mr. Hambleton wanted to send the "whole proposition" to the Fairmount Mining and Machine Company, in West Virginia, but after Mr. Harvey, who examined that plant, reported that it could not be used for manufacturing the machines, which required very accurate workmanship, Mr. Hambleton, who had agreed to advance and raise the money for a plant, went out of the Company, and Mr. Harvey assumed the amount he had advanced, about $15,000.00. He and Mr. Harvey then discussed the matter of financing the company with Mr. Nelligan, of the Safe Deposit Company, and Mr. Karr. They had already ordered machine tools to the amount of $30,-000.00, with the view of starting a plant, and Mr. Harvey agreed to put up $30,000.00 and his brother agreed to put up the same amount, but Mr. Nelligan and Mr. Karr advised against starting a plant at that time, and suggested that they get some responsible manufacturing concern, such as the Poole Engineering and Machine Company and the Bartlett & Hayward Company, to manufacture the machines. Having known Mr. Austin, who was employed by the Poole Engineering Company, for a year or more, he called him up over the 'phone and asked him if his company, the Poole Engineering and Machine Company, would manufacture the gears and if he would come into town and see him. Mr. Austin came to town, and he explained to him that orders for the gears were coming in faster than they could turn out the work with their limited facilities, and that they had to get the machines made somewhere, and wanted to have from two hundred to three hundred machines made. Mr. Austin said he would take the matter up with Mr. Shoemaker, and the next day Mr. Austin called him up and said Mr. Shoemaker would like to meet him and wanted to know if he would come out. He went out to see Mr. Shoemaker and Mr. Austin introduced him. He told Mr. Shoemaker that they would like them to figure on two hundred or three hundred machines, and he said he would look into it and let him know. Some days later Mr. Shoemaker called him up and asked him to come out to see him. He went out

to see Mr. Shoemaker, and he told him that they had come
to the conclusion that they did not want temporary work, but
wanted permanent work, and that as they knew that he, the
witness, and Mr. Harvey were going ahead with plans for
their own factory, they did not care to undertake to manu-
facture two hundred machines, and suggested that he, the wit-
ness, license the Poole Engineering and Machine Company
to build, etc., the machines.   He went back to his office and
consulted Mr. Harvey, and later he and Mr. Harvey went out
to see Mr. Shoemaker and Mr. Shoemaker then made them
an offer.   He and Mr. Harvey returned to Baltimore, and
after further discussion, and after consulting Mr. Nelligan,
they made Mr. Shoemaker a counter proposition, which was
finally accepted, and they entered into the contract referred
to with the Poole Engineering and Machine Company.   When
asked if he ever promised to pay Mr. Austin a commission for
introducing him to Mr. Shoemaker, he said, "Never"; that
Mr. Austin was not present at any of the discussions with
Mr. Shoemaker; never had anything to do with the making of
the contract; that such a thing as paying him a commission
never entered their minds, and was never thought of by them
or mentioned by Mr. Austin; that it was not until a month
or more after the contract was signed that "it apparently
occurred to Mr. Austin he ought to have a commission on the
deal," and that when Mr. Austin mentioned it to him he told
him that if he would render a bill for the services he ren-
dered the year previous, while he, witness, was using his
office, he would gladly pay it, but that he was not entitled to
a commission on the deal with the Poole Engineering Com-
pany; that the only reason he called up Mr. Austin when he
first thought of getting the Poole Engineering and Machine
Company to make the two hundred machines was that he
knew Mr. Austin was in the employ of the Poole Engineering
and Machine Company, and he was the only man he knew in
that company; that otherwise he would have gotten in touch
directly with the General Manager of the Poole Engineering
and Machine Company; that in the Spring or Summer of

1916, when he and Mr. Harvey were having parts of the machines made at different places in Baltimore, Mr. Austin came to see him soliciting business for the Poole Engineering and Machine Company, and suggested to them to send some of the work to that company, and that they did give the Poole Engineering and Machine Company an order for some work; that he never saw Mr. Austin from that time until he called him up over the 'phone, as stated, and asked him if his company would make the two hundred machines.

We have referred to the evidence in the case at some length because the defendant by his first prayer sought to withdraw the case from the jury on the ground that there was no legally sufficient evidence to entitle the plaintiff to recover, and in his second prayer asked the Court to instruct the jury that there was no legally sufficient evidence to support a recovery under the seventh count of the declaration.

At the conclusion of the case the Court below at the instance of the plaintiff instructed the jury as follows: "If the jury shall find from the evidence that the plaintiff and defendant made an arrangement whereby the defendant was to compensate the plaintiff for services rendered the defendant by the plaintiff, and further finds such services were rendered, as mentioned in the evidence, and the defendant promised and agreed with the plaintiff to compensate the plaintiff for his services, and to treat the plaintiff in such compensation, fair and right, then if the jury so find, the plaintiff is entitled to recover such an amount as the jury may find from all the evidence to be fair compensation, but not to exceed the sum of five thousand dollars." This instruction, in addition to being very general, was clearly erroneous in that it totally ignored the evidence of the defendant that the *compensation* agreed upon was a position with the company in the event he and the plaintiff by their efforts succeeded in incorporating one to take over, manufacture and sell the turbo gear machines. If the jury accepted the defendant's version of the agreement, then, notwithstanding they found that he agreed to compensate the plaintiff for his services, the plain-

tiff would not have been entitled to recover unless there was sufficient evidence to show, and the jury further found, that such a corporation had been formed and that the defendant had failed or refused to give the plaintiff the promised position. It was for the jury to determine from all the evidence what the contract between the plaintiff and defendant was, and the prayer should have instructed them as to the law applicable to the facts found by them. *Richardson* v. *Anderson,* 109 Md. 641, and cases therein cited. It is true, the defendant stated that when the plaintiff, about two years later, demanded a commission on the deal with the Poole Engineering and Machine Company he told him that if he would give him a bill for the services he rendered when he was in the plaintiff's office he would gladly pay him, but if the defendant's version of the agreement under which the services were rendered was correct the defendant was under no obligation to do so, and moreover he further testified that the plaintiff refused to render a bill for such services. The appellant contends that the prayer is also defective because the reference therein to $5,000.00 rendered it misleading. But if it was otherwise free from objection we would not consider it erroneous on that ground. The evidence produced by the plaintiff valued his services at more than the $5,000.00 claimed in the declaration, and there was no error in the instruction that the verdict of the jury could not exceed that amount.

The defendant's first prayer was properly rejected. Some of the evidence produced by the plaintiff tended to show that the agreement between the plaintiff and defendant was that the defendant would compensate the plaintiff for his services and for the material he supplied while the defendant was in his office, when the defendant was in a position or was able to do so, regardless of whether they succeeded in forming a corporation to take over the patents and manufacture the machines. If the jury adopted that view of the case the plaintiff was entitled to recover the value of such services and materials. The suit was not brought under the Speedy Judg-

ment Act, and the plaintiff was not, therefore, confined by the Act of 1914, Chapter 378, to the account filed with the declaration.

The only other objection urged by the appellant to the ruling of the Court below on the prayers is to the rejection of his second, third and fourth prayers. His second prayer, which asserted that there was no legally sufficient evidence to entitle the plaintiff to recover under the seventh count, should have been granted. That count bases the right of recovery on the allegations that the plaintiff opened and *conducted* negotiations with the Poole Engineering and Machine Company which resulted in the contract of January, 1917, licensing that company to manufacture, etc., the machines, and also the contract, of several months later, by which the Poole Engineering and Machine Company employed the defendant. There is not the slightest evidence to support these averments. The plaintiff himself did not testify that he *conducted* the negotiations, and all the evidence in the case is clearly to the effect that he took no part in them, and was not present during any of the conversations between Mr. Shoemaker, Mr. Fast and Mr. Harvey. The plaintiff did testify that Mr. Fast asked him if the Poole Engineering and Machine Company would manufacture two or three hundred machines for him, that he thereupon explained the machine and value of the patents to Mr. Shoemaker, and that the next day he introduced Mr. Fast to Mr. Shoemaker, but this evidence fails to support the allegation that he conducted the negotiations resulting in the contracts referred to, particularly when those negotiations related to an entirely different matter from the one in view when he introduced the defendant to Mr. Shoemaker. We are not called upon in this connection, or in this case, to decide whether the plaintiff can recover for introducing Mr. Fast to Mr. Shoemaker. That is not the claim presented in the seventh count. The evidence shows that the plaintiff did render services and furnish materials to the defendant for which, under his version of the agreement between them, he is clearly entitled to recover, but there is

no evidence in the record to support the claim made in the seventh count of the declaration.

The proposition presented by defendant's third prayer was that as the plaintiff was employed by the Poole Engineering and Machine Company he could not act as the agent of the defendant or recover for any services rendered in the negotiations resulting in the contracts referred to between that company and Mr. Fast. Mr. Shoemaker, who represented the Poole Engineering and Machine Company, testified that he never knew that the plaintiff intended to claim a commission based on those contracts, and if there was any evidence in the case that the plaintiff participated in such negotiations there might be some force in the contention made by this prayer. But, as we have said in disposing of the defendant's second prayer, there was no such evidence, and therefore the prayer would have had a tendency to confuse and mislead the jury.

The defendant's fourth prayer was properly refused. If the agreement between the plaintiff and defendant was, as some of the evidence for the plaintiff tended to show, that the defendant was to compensate the plaintiff for services he rendered and the materials he furnished when he was able to do so, regardless of whether they succeeded in forming a company to take over the patents, etc., the fact that the plaintiff, after rendering the services, abandoned any further effort to form such a company would not deprive him of his right to compensation for such services and materials, unless there was an agreement to that effect.

We have disposed of the exception to the ruling of the Court on the prayers notwithstanding the appellant included in the bill of exception an exception to the ruling of the Court on the special exceptions to plaintiffs prayer, which, according to the proper practice, as repeatedly pointed out by this Court, should have been made the subject of a separate exception.

The first, second, fifth and sixth exceptions were not pressed by the appellant. In the third exception the plaintiff was

asked if he knew what the defendant received under the con-
tracts with the Poole Engineering and Machine Company.
As there was no evidence to show that the contracts referred
to were the result of negotiations conducted by him on behalf
of the defendant the evidence was not material.   Even if it
be assumed that the plaintiff is entitled, under the circum-
stances disclosed by this record, to recover for introducing the
defendant to Mr. Shoemaker, the *amount* the defendant real-
ized from the contracts made with that company would not
be material upon any theory warranted by the evidence in
the case.

We see no objection to the question in the fourth excep-
tion.   It was asked for the purpose of showing by Mr. Har-
man what connection the plaintiff had with the introduction
of Mr. Harvey to the defendant.   But even if the question
was objectionable the answer of the witness did not injure
the defendant.

The seventh, eighth and ninth exceptions were to questions
eliciting evidence of the fact that the defendant was employed
by the Poole Engineering and Machine Company and of the
amount of his salary, etc., and for the reasons stated in dis-
posing of the third exception we think there was error in per-
mitting them to be answered.

The evidence referred to in the tenth exception was offered
for the purpose of showing by Mr. Shoemaker that the plain-
tiff told him that he was interested in the outcome of the
negotiations between Mr. Shoemaker and Mr. Fast before
the negotiations were completed, and was not pertinent be-
cause there was no evidence to show that the plaintiff partici-
pated in such negotiations.   The answer of the witness could
not, however, have injured the defendant.

There was serious error in the rulings in the eleventh and
twelfth exceptions.   The witness stated that he was a lawyer
and had been practicing his profession in Baltimore since
1892, and had also been interested in developing properties,
and financing properties, propositions and companies, and
had "been in almost every line, including patents and other

things." After further stating that he had heard all the evidence of the plaintiff's witnesses, except that of Mr. Robinson, who was called later, he was asked to tell the Court and jury, "assuming that the testimony of the plaintiff, Mr. Austin, * * * are facts," what in his judgment would be "a fair compensation to the plaintiff for the services he has performed." After the objection to the question was overruled, the witness replied: "If Mr. Austin had done nothing but consummate the deal with the Poole Engineering and Machine Company the very minimum commission he was entitled to was ten per cent.; I do not think anybody would have done it for a cent less than that; as to the value of his work and report that seems to be very moderate." When asked to give his reasons for his conclusions, he explained the difficulty of financing patents, particularly at that time. The question not only ignored the testimony of the other witnesses for the plaintiff as to the services rendered by the plaintiff, but the statements of the witness failed entirely to show that he was qualified to express an opinion as to the value of the services which the plaintiff testified he had rendered. His qualification as a lawyer, and the fact that he had some experience in development of property and *financing* propositions, including patents, even if his *personal experience* could qualify him to express an opinion of the value of services rendered in such cases, certainly did not make him competent to express an opinion as to the value of services rendered by a mechanical engineer in passing upon the value, etc., of patents for a mechanical device and in conducting and making reports of tests of the machine. It is not clear upon what theory this witness was produced, unless it was upon the theory that he was competent to testify to the value of services performed in *financing* propositions. But there was no evidence in the case to show that the plaintiff rendered such services. There was no motion to strike out the witness's answer to the question in the eleventh exception, but when he was asked to give his reasons for his conclusion, he should not have been permitted to do so over the objection of the defendant, because

his answer to the previous question was based upon the assumption that the plaintiff had *consummated* the deal with the Poole Engineering and Machine Company when there was, as we have stated, no evidence in the case to warrant such an assumption. The appellee contends that the exception to the question in the eleventh exception did not raise the question of the qualification of the witness as an expert. The contrary rule was applied in *United Rys. Co.* v. *Corbin,* 109 Md. 461, and appears, from the report of the case, to have been followed in *Rittenhouse, W. Auto. Co.* v. *Kissner,* 129 Md. 102.

The thirteenth exception was to the introduction by the plaintiff of a letter from his counsel to Mr. Karr, counsel for the defendant, and we think the exception should have been sustained.

We see no objection to the evidence referred to in the fourteenth exception, or how the defendant could have been injured by its admission, even if it was objectionable. It showed that Mr. Harman was not a salaried employee of the plaintiff at the time Mr. Harman was assisting the defendant.

The evidence referred to in the fifteenth exception was not material and we see no error in striking it out, assuming that it was stricken out, which does not clearly appear from the record.

For the reasons stated in disposing of the fourteenth exception there was no error in refusing to strike out the evidence referred to in the sixteenth exception.

Because of the errors pointed out in the rulings of the Court below in the third, seventh, eighth, ninth, eleventh, twelfth, thirteenth and seventeenth exceptions, the judgment appealed from must be reversed and case remanded for a new trial.

*Judgment reversed with costs, and a new trial awarded.*